Harold P. Kelly, J.
This court has found that the present districting and apportionment of the members of the Common Council of the City of North Tonawanda, New York, violates the United States and New York State Constitutions. The court has ordered the defendants’ Common Council to submit a permanent plan of redistricting or reapportionment that complies with the constitutional mandate, that as nearly as practicable one man’s vote is to be worth as much as another’s.
The Common Council of the City of North Tonawanda is now acting under a weighted voting plan heretofore approved by this court.
The defendants, pursuant to this direction of the court, have submitted a proposed plan of redistricting the legislative body of the City of North Tonawanda that provides for two councilmen to be elected from four wards and also provides that the *594 Mayor shall become a voting member of the council with no veto power.
The defendants, in drawing the new ward boundary lines, utilized the voter registration figures published March, 1969 which show there are 15,140 voters registered in the City of North Tonawanda. This yields a norm of 3,785 voters per ward. The proposed new wards as composed show a variation in registered voters from 3,969 voters in the II Ward (approximately 4.9% over the norm) to 3,700 voters in the III Ward (approximately 2.2% under the norm) or a difference of 7.1%. The defendants’ attorney, in further support of the plan, by his affidavit sworn to August 13, 1969 shows that the proposed wards when the 1967 population census figures are used have a variance in population as follows: Ward I — 2.8% above the norm; Ward II — 0.8% above the norm; Ward III — 3.5% below the norm; and Ward IV — 0.2% below the norm; or, a difference of 6.3%. The defendants, in drawing up the ward boundary lines, utilized existing election districts, because the voter registration figures were available on a district basis, and the defendants assert that to use existing voter districts would be less confusing to the voter.
The defendants, in drawing up their plan of redistricting using registered voters as a basis, rely heavily on chapter 834 of the Laws of 1969 (Municipal Home Rule Law, § 10, subd. 1, par. a, cl. [13], subpar. [c]) which provides: “ (c) As used in this subparagraph the term 1 population ’ shall mean residents, citizens, or registered voters. A population base for such a plan of apportionment shall utilize the latest statistical information obtainable from an official enumeration done at the samé time for all the residents, citizens, or registered voters of the local government. ’ ’ (Emphasis added.)
The defendants state that the use of registered voters as a basis for a plan of reapportionment has been held constitutional by the United States .Supreme Court in Burns v. Richardson, (384 U. S. 73); but it is to be noted that the court on pages 96-97 states: “ We are not to be understood as deciding that the validity of the .registered voters basis as a measure has been established for all time or circumstances, in Hawaii or elsewhere. The District Court was careful to disclaim any holding that it was a ‘perfect basis.’ We agree * * *. We hold that, with a view to its interim use, Hawaii’s registered voter basis does not on this record fall short of constitutional standards.” (Emphasis added.)
The United States Supreme Court, in Kirkpatrick v. Preisler (394 U. S. 526), in discussing the use of “ eligible voter popula *595 tion” for Congressional seats, did not specifically except “ eligible voters ” basis but pointed out that it would be necessary ‘ ‘ to ascertain the number of eligible voters in each district and to apportion accordingly. ’ ’
It should be remembered that there could be a substantial variation in the number of “ eligible voters ” and “ registered voters ” in any given district and in any given year, depending on such factors as local political and economic conditions, which have a great influence on the number of people who register to vote. Also whether or not there is a Presidential election can be an important factor.
In the present case the defendants have available a population census that was taken in 1967. This census was conducted about one year before the registered voters statistics used by the defendants were accumulated during 1968 registration of voters, a Presidential election year.
It is the court’s opinion that where there are recent population figures available the same ought to be used in drawing the boundary lines of new legislative districts. It appears that the use of registered voter figures have been approved only when recent census figures were not available and where the registered voter figures have been shown to reflect approximately the same results as the use of population figures in drawing legislative districts. In addition, the use of registered voter figures has been approved by the courts for an interim plan when an election was imminent.
The next problem presented by the plan submitted is whether under all the circumstances of this case the court should approve a plan where the numerical difference between the wards is 6.3% based on population and 7.1% based on registered voters.
The principle of “ one person, one vote ” mandated by the equal protection clause of the Fourteenth Amendment of the United States Constitution and announced in Reynolds v. Sims (377 U. S. 533) applies to local elective legislative bodies exercising general governmental powers. (Seaman v. Fedourich, 16 N Y 2d 94, 101; Iannucci v. Board of Supervisors, 20 N Y 2d 244, 249.)
The principle of “ one person, one vote ” has been stated in other language. In Wesberry v. Sanders (376 U. S. 1, 7-8) we find it stated in the following language: ‘1 that as nearly as is practicable one man’s vote in a congressional election is to be worth as much as another’s.” In chapter 834 of the Laws of 1969 (Municipal Home Rule Law, § 10, subd. 1, par. a, cl. [13], subpar. [a], subd. [i]) we find the same principle stated in the following language:1 ‘ The plan shall provide substantially equal *596 weight for all the voters of that local government in the allocation of representation in the local legislative body.”
The fundamental goal in drawing any plan of redistricting or reapportionment should be equal representation for equal numbers of people. Chapter 834 of the Laws of 1969 clearly shows a legislative intent to carry out this goal.
The court sees no difference in the constitutional standards to be applied in redistricting Congressional seats and redistricting any other legislative body.
It, therefore, follows that in any plan for redistricting or reapportioning a local legislative body there be a good faith effort to achieve precise mathematical equality and that the de minimis approach be rejected and the legislative body charged with the duty of drawing the plan must justify each variance no matter how small.
The court is cognizant of the fact that no matter how mathematically precise a plan may be drawn at the time of its adoption, the districts will soon be out of numerical balance because of population shifts that are constantly taking place. This change of population puts an even greater premium on having numerical equality at the inception of any permanent plan of redistricting. If the variations from one district to another in the plan submitted are based upon anticipated population shifts, the same must be properly demonstrated to the court.
The court must also reject that part of the plan that makes the Mayor a voting member of the council with no veto. The Charter of the City of North Tonawanda (L. 1907, ch. 752, as amd.) provides for the Mayor’s veto power, (tit. V, § 5). There is no provision in the charter giving the Mayor a vote equal to a member of the council. The court is without authority to amend or declare void a provision in a city charter unless the same is necessary to excise such provision in the charter that causes the legislative body to be unconstitutional.
If the Mayor’s veto power is to be taken away and he is to be given a vote, the same as the members of the council, it will be necessary to have the charter amended by appropriate legislative enactment, and not as a part of the reapportionment that is the basis of this proceeding. One of the purposes of chapter 834 (§ 1) of the Laws of 1969, is “to insure (1) that the electorate of local governments shall have the maximum freedom in selecting for themselves a legislative structure which complies with the requirements of law and at the same time meets the needs of each locality ’ ’. This provision does not confer power on the courts to use legal “ short-cuts ” in making *597 changes in the governmental or legislative structure of any local government.
In addition, it is suggested that the boundary lines of the districts be drawn more nearly in compliance with the standard that “Representation areas shall be of convenient and contiguous territory in as compact form as practicable ” (Municipal Home Rule Law, § 10, subd. 1, par. a, cl. [13], subpar. [a], subd. [iv]), and that the Council consider using an odd number of districts with one councilman from each district.
It is the recommendation of the court that any revised plan submitted to the court be in the form of a local law duly adopted by the Common Council and approved by the Mayor or after the expiration of the time for a veto by the Mayor. The local law is to be subject to the approval of the court, and to a referendum by the electorate if the Common Council adopts such resolution or a petition requiring a referendum is submitted as provided in chapter 834 of the Laws of 1969 (Municipal Home Rule Law, § 24, subd. 2, par. j).
The plan as submitted is disapproved and the same is returned to the Common Council for further study and revision in accordance with this memorandum. Said revised plan is to be submitted to the court on or before December 1, 1969.